**CARLIN COMMUNICATIONS, INC., Sapphire of Arizona, Inc., Joy Communications of California Inc., Lynx Communications of California Inc., Sable Communications of California Inc., Sapphire of Colorado Inc., Sapphire Communications of Florida, Inc., Sapphire Communications of Georgia Inc., Sapphire of Iowa, Inc., Sapphire Communications of Kentucky Inc., Sapphire of Louisiana Inc., Joy Communications of Maryland Inc., Sapphire Communications of Maryland Inc., Joy Communications of Michigan Inc., Sapphire of Michigan Inc., Sapphire of Minnesota Inc., Sapphire of Nebraska Inc., Sapphire of Nevada Inc., Sapphire of Oregon Inc., Joy Communications of Pennsylvania Inc., Sapphire Communications of Pennsylvania Inc., Sapphire Communications of Texas Inc., Sapphire of Virginia Inc., Sapphire of Washington Inc., and Sapphire of Washington D.C. Inc., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and The United States of America, Respondents,**

**Ameritech Operating Companies, American Telephone and Telegraph Co., BellSouth Corporation, Southern Bell Telephone and Telegraph Co. and South Central Bell Telephone Co. ("BellSouth Companies"), Bell Atlantic, and Pacific Bell, Intervenors.**

**No. 87, Docket 87–4054.**

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1987.

Decided Jan. 15, 1988.

As Modified on Denial of Rehearing April 4, 1988.

Norman S. Beier, New York City (Lawrence E. Abelman, Peter J. Lynfield, Carldad Pineiro Scordato, Abelman Frayne Rezac & Schwab, New York City, of counsel), for petitioners.

Diane S. Killory, General Counsel, F.C.C. (Daniel M. Armstrong, Associate General Counsel, Sue Ann Preskill, Counsel, F.C.C., Washington, D.C.; Richard K. Willard, Asst. Atty. Gen., Barbara L. Herwig, John C. Hoyle, Dept. of Justice, Washington, D.C., of counsel), for respondents.

Alfred Winchell Whittaker, Kirkland & Ellis, Washington, D.C., for intervenor Ameritech Operating Co.

Jim G. Kilpatric, Basking Ridge, N.J., for intervenor American Tele. & Tele. Co.

R. Frost Branon, Jr., BellSouth Corp., Atlanta, Ga., for intervenor BellSouth.

John M. Goodman, Bell Atlantic, Washington, D.C., for intervenor Bell Atlantic.

Michael H. Salinsky, Pillsbury, Madison & Sutro, San Francisco, Cal., for intervenor Pacific Bell.

Robert T. Perry, Media Law Clinic, New York Law School, New York City (Connie Moyer-Goodman, John W. Olivo, Jr., Ellen Rossner, Student Interns, of counsel), for amicus curiae New York Civ. Liberties Union.

Before OAKES and KEARSE, Circuit Judges, and BONSAL, District Judge.[*]

OAKES, Circuit Judge:

The Federal Communications Commission ("Commission" or "FCC") has once again issued regulations establishing a defense to prosecution under section 223(b) of the Federal Communications Commission Authorization Act of 1983, 47 U.S.C. § 223(b) (Supp. I 1983), which regulates interstate "dial-a-porn" services. The Commission adopted the Third Report and Order, Enforcement of Prohibitions Against the Use of Common Carriers for the Trans-

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

mission of Obscene Materials, FCC 87–143, 2 FCC Rcd 2714 (1987),[1] in response to this court's decisions in *Carlin Communications, Inc. v. FCC*, 749 F.2d 113 (2d Cir. 1984) (*"Carlin I"*), and *Carlin Communications, Inc. v. FCC*, 787 F.2d 846 (2d Cir.1986) (*"Carlin II"*). The regulations in the Third Report and Order establish that providers of "obscene or indecent" messages ("the providers") have a defense to prosecution if they (1) require payment by credit card before transmission of the message; (2) require an access code before transmission of the message, issue the code by mail after reasonably ascertaining through receipt of a written application that the applicant is at least eighteen years old, and establish a procedure to cancel the code upon notice that it was lost, stolen, or used by a minor; or (3) scramble their messages so that they can be received intelligibly only by using a descrambling device. In addition, where a provider subscribes to mass announcement services ("MAS") tariffed at the Commission, prior to transmission of the message, it must request in writing that the carrier providing the service identify all adult telephone messages on consumers' bills. 52 Fed.Reg. 17,760, 17,761 (1987) (to be codified at 47 C.F.R. § 64.201). The issue presented here is whether this regulating scheme is a feasible and effective method for restricting minors' access to obscene telephone messages, without unreasonably interfering with the constitutional rights of the service provider to send, and adults to receive, such messages.

## FACTUAL BACKGROUND

While we assume familiarity with our prior decisions in *Carlin I* and *Carlin II*, for ease of consideration here we briefly review the FCC's past efforts to regulate adult telephone message providers. In its First Report and Order, the Commission sought to restrict the operation of petitioner Carlin Communications, Inc. ("Carlin"), and other adult telephone message provid-

ers to the hours between 9:00 p.m. and 8:00 a.m., Eastern Time. 49 Fed.Reg. 24,996 (1984). We held those regulations both overinclusive and underinclusive; the time-channeling regulations denied adults access to dial-a-porn messages during daytime hours but did not prevent minors from calling the service during nighttime hours. *Carlin I*, 749 F.2d at 121. We concluded that the Commission had "failed adequately to demonstrate that the regulatory scheme [wa]s well tailored to its ends or that those ends could not be met by less drastic means." *Id.*

Following *Carlin I*, the Commission adopted a Second Report and Order on October 10, 1985 (published October 22, 1985, 50 Fed.Reg. 42,699). In the Second Report and Order, the Commission rejected all network blocking by which outgoing calls are impeded at telephone company central offices. It found exchange (three- or four-digit) blocking constitutionally flawed because it blocked all "dial-it" messages and ineffective since MAS numbers are not legally or technically required to be assigned to 976 exchanges. It rejected line number (seven-digit) blocking as inadequate to handle the large number of adult message providers currently in operation. The Commission also rejected message scrambling. Although scrambling is technologically feasible and relatively simple, the Commission concluded that it misallocated the burdens by requiring adults who desire to hear the messages to install descrambling devices at a cost of $15 or $20 each. 50 Fed.Reg. at 42,704 paras. 21, 22. The Commission concluded in the Second Report that the most effective means of restricting minors' access to dial-a-porn services, while at the same time minimizing restrictions on adults, was to require providers to send messages only to adults who first obtained an access code or paid by credit card. *Id.* at 42,707 para. 32.

In *Carlin II*, we found that the Commission's findings relative to network blocking were fully supported by the evidence and clearly not arbitrary and capricious. How-

---

**1.** The regulations and a summary of the Third Report were published in the Federal Register on May 12, 1987. 52 Fed.Reg. 17,760 (1987).

ever, we held that the Commission did not adequately consider customer premises blocking and, in particular, the feasibility of shifting the cost of blocking to message providers. *See* 787 F.2d at 855–56. This failure was particularly troubling because access codes were feasible only with two-way transmission. We therefore set aside the regulation as to the one-way, New York Telephone MAS network. *Id.* at 857. In neither *Carlin I* nor *Carlin II* was it necessary to or did we pass on the constitutionality of section 223(b).

The Commission released its Third Notice of Proposed Rulemaking on July 18, 1986, some three months after our decision in *Carlin II.*[2] The Commission first observed that total calling volume to the New York Telephone and New England Telephone and Telegraph Companies' ("NYNEX") "dial-it" system had declined from 471 million calls in 1984 (1.29 million per day) to 159 million calls in the months of January to April 1985 (435,000 per day). Of these, 97 million were made to "adult entertainment numbers" in 1984 (266,000 per day), while 26 million (72,000 per day) were made to such numbers between January and April 1985. In fact, NYNEX had reported that, during the first four months of 1985, total MAS calling volume had risen to 1.32 million calls per day while adult entertainment calls had dropped to 218,000 per day.

Next, the Commission briefly reviewed ways to restrict minors' access to these messages. It noted that New York Telephone Co. ("NYT") planned to install a separate, dedicated one-way system with screening capability. The so-called Varick Cut-Thru System would permit the dial-a-porn operator to implement an access code verification procedure. A screening mechanism at the telephone company's central office would send dial-a-porn calls to the providers' offices where access codes could be verified and the adult messages transmitted directly to the caller. The Commission noted that the Varick system would have a capability of 30,000 calls per hour,

sufficient to handle the 9,089 calls per hour made to adult programming during early 1985. The Notice also discussed the costs and problems associated with customer blocking devices and scrambling. Finally, to comply with *Carlin II*, the Commission sought public comment on the feasibility, the costs and cost allocation, the benefits, and the efficacy of access codes, blocking equipment and scrambling in the region served by NYT. In particular, the Commission sought comment concerning the feasibility of implementing access codes in one-way systems such as NYNEX; the status of the proposed Varick system, and the ability of subscribers to obtain the identity, address, and number of adult telephone message providers.

In response to the Third Notice, the Commission received numerous comments and reply comments. Comments from the following entities are included in our record: Carlin; American Telephone and Telegraph Co. ("AT & T"); Ameritech Operating Companies; Bell Atlantic Telephone Companies; NYNEX; Pacific Bell; Phone Programs, Inc.; the Public Service Commission of the District of Columbia; Southwestern Bell Telephone Co.; Telecommunications Technology Corp.; American Civil Liberties Union ("ACLU"); BellSouth Corp.; United States Telephone Association; and the Media Law Clinic.

Carlin's comments disputed the Commission's conclusion that access codes were the least restrictive alternative. It argued that they are impermissibly overbroad and vague, that any written application procedure would chill expression and would violate individual rights of privacy, and that any requirement that access codes be cancelled on misuse or loss would be impracticable and ineffective. Carlin also contended that screening or blocking is not technically feasible. Noting that this court had already found limitations upon operational hours unconstitutional, Carlin argued that the only constitutionally permissible regu-

---

**2.** A summary of the Third Notice was published in the Federal Register on July 28, 1986. 51 Fed.Reg. 26,915 (1986).

lations were disclaimers and limitations on advertising.

AT & T commented that effective screening could be achieved in conjunction with one-way mass announcement services by connecting interactive access lines to each AT & T 900 service mass distribution center. However, the costs of such screening would be significant. AT & T concluded therefore that message scrambling is a cost-effective and simple alternative within non-interactive networks. It commented that, contrary to the Commission's earlier understanding of descrambling devices, e.g., Second Report, 50 Fed.Reg. at 42,704 para. 22, scrambling technology is not unduly cumbersome. AT & T reported that battery-operated portable descramblers are available at little cost. AT & T commented that customer-premises blocking would be both ineffective and unduly burdensome on persons wishing to restrict access. It also contended that message providers, not common carriers, should bear the costs of the screening procedures. AT & T noted that information concerning message providers may be disclosed pursuant to administrative subpoenas. They added that disclosure of identification information upon request could be a condition of tariff arrangements between telephone companies and message providers.

The Ameritech Operating Companies urged the Commission to focus on requirements for the providers, rather than the telephone companies. It endorsed a multiple-choice defense approach permitting providers to select the most feasible and economical defense for their particular operation and location. It suggested that permissible defenses include the use of credit cards, access codes, or scrambling; the provision of customer-premises blocking devices capable of seven- or ten-digit programming; and the furnishing of information identifying the names and telephone numbers of dial-a-porn services, coupled with billing notification. Ameritech reported the results of a survey conducted on its behalf assessing interest in customer premises blocking devices among randomly selected households with children under eighteen years of age. When price was not mentioned between 70.2% and 73.6% of households were interested in a device or service that would block dial-a-porn calls. However, only 3.3% to 5.4% indicated they would definitely purchase such a device or service if it cost only seventy-five cents per month. Similarly, at a one-time charge of $20, only 2.2% to 4.5% of households indicated they would definitely purchase the product or service.

Bell Atlantic Telephone Companies also endorsed a "menu" of alternative defenses but emphasized that the provider be required to implement the most effective means feasible given the characteristics of its operation. It urged that access codes be the preferred alternative. Bell Atlantic has already developed a billing system to prevent charging persons who call providers but lack an access code. Under its system, a caller is not charged for an audiotext call unless he or she remains on the line for more than ten or twenty seconds. Bell Atlantic requires all providers to notify callers that they are subject to a charge if they remain on the line. The Chesapeake and Potomac Telephone Co. of Maryland offers a similar service for intrastate calls. Bell Atlantic suggested, however, that billing notification be an alternative defense only where providers lack a two-way connection with the caller and the exchange carrier cannot accommodate an access code system. Bell Atlantic commented that several customer premises blocking devices are currently available. One such device, retailing at $89.95, permits callers to program and block up to ten different telephone numbers. Bell Atlantic was not aware of any service listing the telephone numbers of dial-a-porn providers. It stressed that providers must be responsible for administering and financing any customer premises blocking program.

NYNEX also supported a multiple-choice defense. It reported that NYT planned to replace its one-way mass announcement system with a state-of-the-art two-way system by mid-1988. Providing access code capability on NYT's existing 976 mass announcement system would cost over $21 million. However, NYNEX noted that the

Varick system, which provides mass announcement capability to providers with telephone numbers beginning with the prefix 970, could be modified using the Varick Cut–Thru Approach to provide two-way connections. NYNEX noted that to acquire fifty to one hundred circuits, providers would incur one-time costs of approximately $36,000 to $73,000 and recurring monthly charges of $6,000 to $12,000. Installation would take one to three months. The Varick system accommodates 30,000 calls per hour. NYNEX observed that "[i]f all adult channels on both New York Telephone systems were put onto the Varick system and retained their current calling volumes, this capacity limitation would be exceeded." However, it noted that "compliance with the Commission's access code approach will undoubtedly reduce calling volumes."

NYNEX endorsed the use of customer premises blocking devices noting that such devices are available and not difficult to install, maintain, or program. NYNEX noted that allocating the cost of such devices presented difficult administrative and policy problems. While arguing that the telephone companies should not be required to subsidize the cost of such devices, NYNEX suggested that providers that provide such subsidies should have a defense to prosecution under section 223(b). NYNEX reported that NYT will provide the names and addresses of providers using its MAS system to assist those using customer premises blocking devices.

NYNEX also urged that a defense be available to providers that scramble their messages or request that NYT and AT & T block all incoming calls to their numbers, noting that both practices are effective and inexpensive means to restrict minors' access to dial-a-porn messages. Finally, NYNEX reported that adult entertainment calls on NYT had dropped from over 14 million a month in 1983 to below 5 million a month in 1986 and that they constituted 12.9% of all MAS calls, a decrease from 37.6% in 1983.

Pacific Bell commented that the access code and credit card payment requirements were the least restrictive, yet feasible and effective means to restrict minors' access to dial-a-porn. Pacific Bell noted that although it had announced plans to offer a customer premises blocking device to subscribers in earlier submissions to the Commission, it had since concluded that no device existed which could accommodate the total number of dial-a-porn services. Pacific Bell concurred with the Commission's Second Report that message scrambling was not well-tailored to the ends of the regulatory scheme because (1) it was impossible to enforce an age requirement for purchasing a descrambler; (2) such a requirement would not prevent minors from activating decoders purchased by adults; and (3) scrambling would prevent adults from obtaining access to dial-a-porn messages from pay telephones which are not equipped with descramblers.

Phone Programs, Inc., a provider of over sixty dial-it non-adult entertainment programs, also submitted comments. It expressed concern that the Commission might require cessation of all dial-it services, a resolution Phone Programs found unconstitutionally overbroad. It argued that neither the providers of non-obscene, non-indecent programming nor their customers should bear the costs associated with regulating obscene or indecent communication.

The Public Service Commission of the District of Columbia recommended that the FCC require access codes or credit card payment except where access codes were not feasible. In such cases it suggested that providers have a defense to prosecution if they sell at cost customer-premises blocking devices or if they scramble their messages.

Southwestern Bell Telephone Co. endorsed access codes, credit card payment, and scrambling. It argued that providers must bear the costs of the blocking or scrambling devices. Southwestern Bell noted that it provides upon request the name, address, and telephone number of all providers using its 976 services.

Telecommunications Technology Corporation submitted comments urging the Commission only to require providers to

supply information to telephone subscribers. It contended that calls to 976 exchanges should be treated the same as calls to 555, 411, or 900 numbers—the customer should bear the cost of unauthorized calls from the customer's premises. Telecommunications Technology, however, did note that a customer premises blocking device is available for $89.95 which can be programmed to block certain 976 numbers or all calls except specific numbers.

In its reply comments, AT & T endorsed a "multiple choice" defense. It noted that scrambling and interactive access arrangements are the only technically feasible and economically practical means to restrict minors' access to adult telephone messages in non-interactive access arrangements. AT & T concluded that access codes could be used in conjunction with AT & T's 900 service and NYT's Varick Cut–Thru system if message providers purchased dedicated voice-grade access facilities.

Bell Atlantic submitted reply comments contending that access codes were feasible, citing the millions of people who used access codes to place long distance calls. Bell Atlantic added that where access codes were not possible, providers should be able to use scrambling as a defense. It also noted that it no longer believed that billing notification alone should be a defense since Bell Atlantic, and many other exchange carriers, already provided billing notification for audiotext services. It therefore recommended that billing notification be an adjunct to scrambling.

BellSouth Corp., South Central Bell Telephone Co., and Southern Bell Telephone and Telegraph Co. ("BellSouth") submitted reply comments endorsing a "multiple choice" approach. They noted that their two-way system can accommodate access codes and credit card payment.

In its reply comments, Pacific Bell noted that network blocking was not feasible in its region; it would cost $25 million, yet not be able to handle probable calling volumes or operate without administrative difficulties. Pacific Bell added that its 976 network could not accommodate providers' requests to block all incoming interstate calls.

Southwestern Bell Telephone Co. commented in reply that network blocking was prohibitively expensive and ineffective. It reiterated its strong opposition to proposals that local exchange companies subsidize customer premises blocking devices. It suggested that the publication of lists of dial-a-porn telephone numbers would lead to increased calls from minors. In response to Carlin's suggestion that a five-second warning urging minors to hang up precede all adult messages, Southwestern Bell commented that customers who did hang up would still be charged for the calls.

United States Telephone Association submitted brief reply comments stressing that local exchange carriers could not be held responsible for the nature of the providers' communications or for the costs of regulating such services.

In its reply comments the ACLU asserted that the responsibility of protecting children from exposure to sexually oriented materials must lie with parents, not the government. It argued that the underlying statute, section 223(b), was unconstitutional. The ACLU added that scrambling and customer premises blocking were less restrictive means of implementing that section than were access codes. It urged the Commission to rescind its rule, adopt the customer premises blocking approach, and allocate all of the associated costs to the telephone subscribers.

NYNEX's reply comments noted that it already provided billing notification for all interstate dial-a-porn calls but that it could not report local calls on customers' bills without extensive and expensive modifications to NYT's system. NYNEX did not object to providers' inserting messages instructing callers that the messages were intended for adults only, but added that the calling parties would be charged even if they hung up after hearing the warning message. It added that, upon a customer's request and payment, it would install a standard network interface device to facili-

tate the installation of a customer premises blocking device.

The Media Law Clinic of New York Law School submitted a statement by John W. Olivo, Jr., a law student with training in electrical engineering. He proposed that a provider preface its message with a three-part tone burst designed to activate a listening device installed at the customer's premises. Upon "hearing" the tone burst, the device would immediately disconnect the telephone line, so that the caller could not hear the message. A "listening" device could be installed at the terminal block or at individual outlets. While such devices are not yet manufactured, Olivo suggested similar technology presently costs between $5 and $10. Southwestern Bell, Bell Atlantic, and NYNEX commented favorably on Olivo's proposal, though the latter two added that the system needed further study.

In the Third Report, the Commission stated that its objective was "to select the option effectively restricting access to the communications in question to adults which is the least intrusive upon protected forms of expression." 2 FCC Rcd at 2719 para. 32. It rejected customer premises blocking on the basis that there is "no demonstration in the record that such devices could be effective" since they are "easily disabled by unplugging, or by reprogramming, by the minor." *Id.* at 2719 para. 34. Moreover, if the device were placed at the network interface or demarcation point of the premises, many parents would have to install an interface jack at a cost of $25 to $65. If the demarcation point is outside the residence or in a less accessible location, reprogramming the device to block new or changing numbers would be difficult. *Id.* The Commission referred to Ameritech's survey that only 5% or fewer families would use customer premises blocking devices, even at nominal costs. *Id.* at 2720 para. 35. The Commission noted that such devices would block calls by adults, especially if the devices were placed at inaccessible locations. *Id.* at 2720 para. 36. Relying on 1980 census figures that there are 30 million families with children under eighteen, and assuming that the typical

cost per family of customer premises blocking devices was $25, the Commission calculated that, if 5% used the devices, the total cost would be $37.5 million. *Id.* at 2720 para. 37. The Commission further estimated that if providers covered one-third of that cost, each of the one hundred or so adult message providers would be responsible for $125,000. *Id.*

The Commission noted that since access codes could be used within the NYNEX system in conjunction with the Varick system, it was reestablishing access codes as a defense to prosecution in areas served by NYT. *Id.* at 2720 para. 39. The Commission considered the burden of filling out an application form to obtain an access code to be minimal. *Id.* at 2724 n. 24. It was not persuaded that the alleged reluctance of adults to disclose their identity to adult message providers made the access code plan intrusive. The Commission said:

> Such disclosure is already undertaken when persons call live adult services and pay by credit card. We have not been informed that this method of payment has had any stifling effect on live adult message services. Disclosure of identity is also already entailed in normal billing operations by carriers for calls to public announcement service numbers. We additionally note that any disclosure encompassed in an access code system is not required to the government but to private interests who have invited callers to enter into a voluntary commercial transaction. Thus, the alleged reluctance of adults to disclose their identity arises from concerns relating to the commercial interests to whom the disclosure is made. In any event, we believe that these concerns are within the ability of the message provider to control or ameliorate by assurances of, and actual responsible use of, information obtained from callers.

*Id.*

The Commission also added scrambling as an available defense citing AT & T's figures that scrambling devices cost between $150 to $2,500 and descrambling devices cost approximately $15. *Id.* at 2720 para. 41. It suggested that "the message

provider could use sale of descramblers as an additional business opportunity." *Id.* The Commission concluded that scrambling was less expensive than customer premises blocking and that the cost would be acceptable to message sponsors and their customers. *Id.* It observed that the regulation's effectiveness depended on a ban on sales of descramblers to minors. It urged states to amend existing regulations governing the sale of adult products to minors to prohibit the sale of descramblers to minors. *Id.* at 2722 para. 46. It suggested that all adult message providers adopt a uniform method of scrambling and directed AT & T to submit complete technical specifications for its scrambling product. *Id.* at 2722 para. 48.

The Commission concluded that billing notification would not by itself be an effective method of implementing section 223(b). *Id.* at 2721 para. 42. However, it found no feasibility or cost problems associated with billing notification for AT & T's 900 service. *Id.* at 2721 para. 44. Consequently, it announced an additional requirement that AT & T 900 service providers request billing notification as a prerequisite to obtaining a defense to prosecution. *Id.* at 2722 para. 47. The Commission directed AT & T to file appropriate tariff provisions providing for identification of calls to adult message sponsors on its dial-it service.[3] *Id.*

The petition to review followed.

### DISCUSSION

We reiterate the legal standard for analyzing the FCC's dial-a-porn regulations set forth in *Carlin I,* 749 F.2d at 121, quoted in *Carlin II,* 787 F.2d at 855:

> because the regulation is content based— it does not apply to all dial—it services, but only to those transmitting obscene or indecent messages—we scrutinize it more closely.

Under this more exacting scrutiny, we must determine whether the regulation precisely furthers a compelling governmental interest. The interest in protecting minors from salacious matter is no doubt quite compelling. Such an interest must be served, however, only by "narrowly drawn regulations," that is, by employing means "closely drawn to avoid unnecessary abridgment." The Government bears the heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression. And the State may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations.

(Footnote and citations omitted.) *See also City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) ("This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment.").

■ The statute and the regulation were designed to protect minors from obscene speech, *see, e.g.,* 129 Cong. Rec. S16,866 (daily ed. Nov. 18, 1983) (statement of Sen. Trible); 52 Fed.Reg. at 17,760, which is a compelling government interest. *See Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Carlin I,* 749 F.2d at 121. As a preliminary matter, we find that the record supports the FCC's conclusion that a scheme involving access codes, scrambling, and credit card payment is a feasible and effective way to serve this compelling state interest.

In concluding that access codes were feasible in the NYNEX region, the Commission relied upon NYNEX's assertion that its replacement system will be able to provide two-way communication by mid–1988 and the assumption that the Varick Cut–Thru system is capable of handling adult entertainment services until then. The Commission noted that although under this approach, providers would incur estimated additional one-time charges of up to $73,000, and monthly recurring charges of

---

**3.** AT & T has not taken any appeal so far as our record shows.

up to $12,000, "[a]dult message sponsors have failed to provide any cost data suggesting that these costs are unreasonable in relation to the revenues obtained from adult message services provided over carrier public announcement offerings." 2 FCC Rcd at 2724 n. 23. In establishing scrambling as an alternative defense, the Commission reversed its decision issued in the Second Report and Order rejecting the method. 50 Fed. Reg. at 42,704 paras. 21–22. An agency may change its policies or regulations provided it supplies reasoned analysis explaining the change. *Office of Communication of the United Church of Christ v. FCC,* 560 F.2d 529, 532 (2d Cir. 1977). Here the Commission initially believed that descramblers had to be installed at the customer's premises. It was concerned that this would impose a burden on customers and prevent adults from obtaining access to the recorded messages from coin-operated or pay telephones not equipped with decoding devices. 50 Fed. Reg. at 42,704 para. 22. AT & T's comments in the present proceedings describe, however, a portable battery-operated descrambling device. It requires no installation and is simply held against the receiver's earpiece. The Commission reasonably concluded that "while scrambling would be effective at all locations, use of an inexpensive portable device would permit access by adults from virtually any telephone including pay telephones." Third Report, 2 FCC Rcd at 2725 n. 25. Of course, nonportable devices could be used in the home if desired. We agree with the Commission that the message provider could use sale of descramblers as an additional business opportunity. Fifteen dollars does not seem like an excessive cost when one considers prices for other forms of entertainment in this day and age. We conclude that the Commission provided a reasonable analysis explaining its decision to add scrambling as an optional defense.

■ The Commission bore its burden of showing that the compelling government interest in protecting minors from obscene telephone messages could not be served by less restrictive means. It adequately considered the feasibility and costs of customer premises blocking equipment. Given reports that the cost of a device which could block outgoing calls or otherwise terminate a call to adult message providers ranged from $5 to $89, it reasonably assumed that $25 would be the average cost per household. It noted that providers would potentially be required to supply customer premises blocking devices to the entire country as section 223 envisions procedures that restrict *interstate* access to adult messages. In light of its determination that the devices could be easily disabled by minors and that they nevertheless blocked some calls by adults, the Commission reasonably concluded that the high cost associated with customer premises blocking was not justified.

■ Theoretically, a beep-tone device, suggested by the Media Law Clinic of New York Law School and qualifiedly supported by three telephone companies, would avoid the problems associated with access codes and scrambling, at a relatively low cost for providers and customers. The Commission observed that since it had not been shown that a significant percentage of households would use this beep-tone device, the device would not be effective in achieving the purposes of section 223, a conclusion having little or no evidentiary support in the record. However, as the Commission noted, the beep-tone device has not actually been manufactured, even in prototype. As some carriers raised questions concerning its technical feasibility, the Commission held that "substantial limitations exist with establishment of this device as a regulatory requirement *at this time.*" 2 FCC Rcd at 2724 n. 13 (emphasis added). When such a device or any other less restrictive technology becomes available, we direct the FCC to reopen its proceedings to consider the costs and benefits of adding its use as an optional defense. In this way, the Government can fulfill its "heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression." *Carlin I,* 749 F.2d at 121.

■ Of course, even the least restrictive means of regulation must be reasonable as assessed by balancing the limits on free speech against the benefits of the regulation. Here, the alternatives offered to the providers do not unreasonably restrict adults' access, especially given the proviso that the proceedings will be reopened if a beeper device or any other feasible and effective method becomes available that is less restrictive to adults' access. The FCC regulations are analogous to the requirements that sexually oriented materials be displayed behind blinder racks, *M.S. News Co. v. Casado,* 721 F.2d 1281, 1287 (10th Cir.1983), or be kept in sealed wrappers behind an opaque cover or in a separate adults-only section of the book store. *Upper Midwest Booksellers Ass'n v. City of Minneapolis,* 780 F.2d 1389, 1390–01 (8th Cir.1985) (amended 1986). In each case adults continue to have access to the materials, with minimal inconvenience, while minors' access is restricted. *But see American Booksellers Ass'n, Inc. v. Virginia,* 802 F.2d 691, 696 (4th Cir.1986), *prob. jur. is. noted,* —— U.S. ——, 107 S.Ct. 1281, 94 L.Ed.2d 140 (1987). No censorship of the content is involved.

■ Petitioners argue that the FCC regulations and, in particular, the written application required for obtaining an access code, impermissibly chill the First Amendment rights of adults wishing to receive sexual messages over the telephone. They suggest that many adults will not exercise their First Amendment rights because they fear that the Government can discover their identities by using its subpoena power to obtain the providers' records.[4] This argument essentially claims that the regulation even if valid as applied to Carlin is overbroad because it affects others not before the court. The traditional rule is that a party to which a statute may be applied constitutionally may not facially challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court. *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982). The First Amendment overbreadth doctrine is an exception to this principle. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612–13, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). However, the overbreadth doctrine is "strong medicine," employed "only as a last resort." *Id.* at 613, 93 S.Ct. at 296. Thus, the overbreadth must be "substantial" before the statute involved will be invalidated on its face. *Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361. The possibility that at some point the Government might obtain the names of the recipients of obscene telephone messages by subpoena is not sufficiently substantial. Despite what we said about "potential chilling effect" in *Carlin II,* 787 F.2d at 856 n. 7, neither *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), nor *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), is implicated. *Talley* involved revealing the names of all persons who wrote or distributed handbills to the public at large. 362 U.S. at 60–61, 80 S.Ct. at 537. *NAACP* involved disclosing names of members of an organization to a state government in a state where such exposure had led to "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462, 78 S.Ct. at 1172. Here, as the Commission pointed out, disclosure would only be to private interests who have invited callers to enter into a voluntary commercial transaction. Third Report, 2 FCC Rcd at 2724 n. 24.

■ Having found the regulations valid,[5] we must now address the constitutionality

---

4. Lending weight to Carlin's argument is the fact that the United States Attorney for the District of Utah, after obtaining indictments charging Carlin, two of its officers, an employee, and an actress with violating 47 U.S.C. § 223(a) and 18 U.S.C. §§ 1462 and 1465, attempted to subpoena records both from Carlin and from Mountain Bell concerning the identity of persons who voluntarily accessed Carlin's message service in New York. The indictments were later dismissed. *United States v. Carlin Communications, Inc.,* 815 F.2d 1367 (10th Cir.1987).

5. We are also unpersuaded by Carlin's contention that the regulatory system now in place is an impermissible taking of Carlin's property in violation of the Fifth Amendment. *See Penn Central Transp. Co. v. New York City,* 438 U.S.

of the underlying statute, 47 U.S.C. § 223(b). Carlin argues that the statute is unconstitutionally defective in four ways: first, by its vagueness and overbreadth; second, because it violates due process; third, because it creates an impermissible national standard of obscenity; and fourth, because it constitutes an unconstitutional delegation of authority to the Commission.

■ As a preliminary matter, we note that we must construe the statute to avoid constitutional problems if it is susceptible to such a limiting construction. *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932). *See also Lowe v. SEC*, 472 U.S. 181, 206 n. 50, 105 S.Ct. 2557, 2571 n. 5, 86 L.Ed.2d 130 (1985) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 697, 104 S.Ct. 3262, 3292, 82 L.Ed.2d 487 (1984) (Stevens, J., concurring in part and dissenting in part) ("In areas where legislation might intrude on constitutional guarantees, we believe that Congress, which has always [*sic*] sworn to protect the Constitution, would [*sic*] err on the side of fundamental constitutional liberties when its legislation implicates those liberties.")).

Carlin's first argument is that the statutory language, "obscene or indecent," is vague and overbroad. The statute as originally proposed by Rep. Thomas J. Bliley, Jr., and as adopted by the Committee on Energy and Commerce used the words "obscene, lewd, lascivious, filthy, or indecent." H.R. 2755 § 8(b)(1)(A), *reprinted in* H.R. Rep. No. 356, 98th Cong., 1st Sess. 3 (1983), 1983 U.S.Code Cong. & Admin.News 2219. Rep. Bliley later accepted and cosponsored a Judiciary Committee amendment evidently engineered by Rep. Robert W. Kastenmeier omitting the words "lewd, lascivious, filthy," on the following basis:

This change is merely to clarify that Congress intends to be consistent with Supreme Court rulings on obscenity which require a violation of community standards and an appeal to prurient interests. In *Manual Enterprises v. Day*, 370 U.S. 478 [82 S.Ct. 1432, 8 L.Ed.2d 639], Justice Harlan observed that though words such as these have different shades of meaning in common usage, they are all aimed at obnoxiously debasing portrayals of sex. Therefore, it is not necessary to keep the litany of terms as currently in the statute to prohibit that kind of material. It was necessary, however, to maintain the term "indecent" since the Supreme Court upheld the FCC's assessment of a fine based on indecent material in the Pacifica case.

I would observe as an aside that the ruling in Pacifica clearly affirms the FCC's ability and authority to examine material to determine whether it is obscene or indecent and to assess fines on that basis. This amendment clarifies that question and obviates the need for the FCC's pending inquiry on that issue, though I believe it was absurd for the FCC to ever consider their authority in that area questionable, based on Pacifica.

129 Cong.Rec. H10,559, H10,560 (daily ed. Nov. 18, 1983) (statement of Rep. Bliley). *See also* 129 Cong.Rec. E5,966–67 (daily ed. Dec. 14, 1983) (statement of Rep. Kastenmeier).[6]

The use of "indecent" was clearly made with *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), in mind. *Pacifica*, of course, held that, pursuant to 18 U.S.C. § 1464 (1976), the Commission could regulate "a radio

---

104, 123–28, 98 S.Ct. 2646, 2659–61, 57 L.Ed.2d 631 (1978); *Metropolitan Transp. Auth. v. ICC*, 792 F.2d 287 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986).

**6.** "[T]he amendment deletes the terms "lewd, lascivious, filthy" from the bill, in accordance with Supreme Court cases limiting the regulation of speech to obscene or indecent language to the extent such regulation is permitted by the Constitution. See *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607,

37 L.Ed.2d 419 (1973). Thus, an earlier case cited by Mr. Bliley, *Manual Enterprises v. Day*, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), was decided without the benefit of more recent Supreme Court refinements of first amendment protections and, therefore, reference to that case does not authorize the Federal Communications Commission to regulate beyond constitutional boundaries."

129 Cong.Rec. E5,966 (daily ed. Dec. 14, 1983) (statement of Rep. Kastenmeier).

broadcast that is indecent but not obscene." *Id.* at 729, 98 S.Ct. at 3030. The broadcast, entitled "Filthy Words," had used, according to the Commission, "language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience." *Id.* at 732, 98 S.Ct. at 3031 (quoting 56 F.C.C.2d 94, 98 (1975)). The Court noted that the statutory language of 18 U.S.C. § 1464, "obscene, indecent, or profane," was "written in the disjunctive, implying that each has a separate meaning." *Id.* at 739–40, 98 S.Ct. at 3035. The Court went on to cite cases construing similar disjunctive terminology, "obscene, lewd, lascivious, indecent, filthy or vile," as limited to obscenity as defined in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and its predecessors.[7] *Pacifica,* 438 U.S. at 740, 98 S.Ct. at 3035 (discussing *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. 12 200–Ft. Reels of Film,* 413 U.S. 123, 130 n. 7, 93 S.Ct. 2665, 2670 n. 7, 37 L.Ed.2d 500 (1973) (dicta); *Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 482–84, 82 S.Ct. 1432, 1434–35, 8 L.Ed.2d 639 (1962) (Harlan, J.)). Pointedly the *Pacifica* Court noted that "[i]n *Hamling* ... by reading into [18 U.S.C. § 1461] the limits set by *Miller v. California, supra,* the Court adopted a construction which assured the statute's constitutionality." *Pacifica,* 438 U.S. at 740, 98 S.Ct. at 3035. The *Pacifica* Court distinguished section 1464, the statute concerning public broadcasting, from the statute in *Hamling* "deal[ing] primarily with printed matter enclosed in sealed envelopes mailed from one individual to another," and held that Congress could regulate indecent but not obscene speech when transmitted in broadcasts but not when sent through the mail. *Id.* at 741, 98 S.Ct. at 3036.

The *Pacifica* Court declined to endorse the Commission definition of what was indecent, saying instead:

It is appropriate, in conclusion, to emphasize the narrowness of our holding. This case does not involve a two-way radio conversation between a cab driver and a dispatcher, or a telecast of an Elizabethan comedy. We have not decided that an occasional expletive in either setting would justify any sanction or, indeed, that this broadcast would justify a criminal prosecution. The Commission's decision rested entirely on a nuisance rationale under which context is all-important. The concept requires consideration of a host of variables. The time of day was emphasized by the Commission. The content of the program in which the language is used will also affect the composition of the audience, and differences between radio, television, and perhaps closed-circuit transmissions, may also be relevant. As Mr. Justice Sutherland wrote, a "nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard." *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303. We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene.

438 U.S. at 750–51, 98 S.Ct. at 3041 (footnote omitted). Justice Powell's concurring opinion which gave the Court a majority also emphasized that the Court's holding was confined to the facts. "The Court today reviews only the Commission's hold-

---

7. In *Miller* the Supreme Court explained that before material may be found to be unprotected obscene speech, the trier of fact must conclude that:

"the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest ... [;] the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable

state law; and ... the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted). The Court further observed that "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct...." *Id.* at 27, 93 S.Ct. at 2616.

ing that [George] Carlin's monologue was indecent 'as broadcast' at two o'clock in the afternoon, and not the broad sweep of the Commission's opinion." *Id.* at 755–56, 98 S.Ct. at 3043 (Powell, J., concurring).

As we noted in *Carlin I*, the Court in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), emphasized the narrowness of the *Pacifica* holding.

> *Bolger* thus single[d] out the broadcasting media as subject to a "special interest of the federal government in regulation" that "does not readily translate into a justification for regulation of other means of communication."

749 F.2d at 120 (quoting *Bolger*, 463 U.S. at 74, 103 S.Ct. at 2884). Thus the Court struck down as unconstitutional a law regulating mailings advertising birth control, a law which supporters argued protected children from exposure to sexually explicit offensive material. *Bolger*, 463 U.S. at 71, 103 S.Ct. at 2883. The Court noted that "[t]he receipt of mail is far less intrusive and uncontrollable," *id.* at 74, 103 S.Ct. at 2884, than broadcasting. For similar reasons, some courts have struck down legislation limiting adult access to indecent speech on cable television. *See, e.g., Cruz v. Ferre*, 755 F.2d 1415, 1421 (11th Cir. 1985); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 48 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Community Television of Utah, Inc. v. Roy City*, 555 F.Supp. 1164 (D.Utah 1982). The Eleventh Circuit distinguished cable television from radio broadcasting because cable subscribers must affirmatively sub-

scribe to the service and because technology exists to enable parents to prevent children's access to objectionable cable programs. *Cruz*, 755 F.2d at 1420. For some of the same reasons, telephone calls made by an individual over a private line differ significantly from the public broadcast in *Pacifica*. *See Carlin Communications, Inc. v. Mountain State Tel. & Tel. Co.*, 827 F.2d 1291, 1296 (9th Cir.1987); Note, *Telephones, Sex, and the First Amendment*, 33 U.C.L.A.L.Rev. 1221, 1243–46 (1986). We conclude that the *Pacifica* decision does not justify the regulation of indecent telephone messages.

 *Pacifica* did *not* decide that the indecent broadcast "would justify a criminal prosecution." 438 U.S. at 750, 98 S.Ct. at 3041. Here the statute specifically authorizes prosecution. Were the term "indecent" to be given meaning other than *Miller* obscenity, we believe the statute would be unconstitutional. Congress clearly wanted to regulate adult telephone messages only so far as was constitutional. The House Energy and Commerce Committee report emphasized that "[t]he Committee intends that enforcement of this section be consistent with Supreme Court rulings on obscenity." H.R.Rep. No. 356, 98th Cong., 1st Sess. 19, *reprinted in* 1983 U.S. Code Cong. & Admin.News 2219, 2235. Sponsors of the legislation, including Representatives Bliley and Kastenmeier, stressed that the legislation regulate obscenity within constitutional boundaries. *See, e.g.*, 129 Cong. Rec. E5,966–67 (daily ed. Dec. 14, 1983) (statement of Rep. Kastenmeier).[8] But even if we incorrectly in-

---

**8.** "I would like to take issue with the restrictive interpretation by my colleague of the regulations to be issued by the FCC under section 223(b)(2) of my amendment. As noted in my own earlier remarks:

> Congress intends that the FCC promulgate reasonable time, place, and manner restrictions calculated to restrict access to prohibited communications by persons under 18 years of age.

Under the Supreme Court's holding in *Butler v. Michigan*, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed. 2d 412 (1957), Congress cannot expect the FCC to impose blanket restrictions on dial-a-porn services if time, place, and manner restrictions are technically infeasible or impracticable. In

Butler, the Supreme Court struck down as unconstitutional a statute that had the effect of preventing adults from having access to materials judged to have a potentially deleterious influence on children. *Id.* at 382–83, 77 S.Ct. at 525. The Court explained that the statute would have reduced the adult population to reading only what was fit for a child. *Id.* at 383, 77 S.Ct. at 526. The principle is equally applicable here, and so we have carefully constructed section 223, as amended, to avoid reducing the adult population to hearing only what is fit for a child. We leave it to the FCC to prescribe the specific regulations that permit adult access while limiting children's access. If, however, no such regulations are feasible, then less restrictive measures rather than broader restric-

terpret congressional intent, the words "or indecent" are separable so as to permit them to be struck and the statute otherwise upheld. *See Regan v. Time, Inc.*, 468 U.S. 641, 652–53, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). As the Court there noted:

> Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability. " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' "

*Id.* at 653, 104 S.Ct. at 3269 (citations omitted). Using this standard we believe the invalid part of section 223 may be dropped and that the remainder of the statute is fully operative.

 We are also unpersuaded by Carlin's remaining facial constitutional challenges to section 223(b). The statute does not create an impermissible national obscenity standard any more than do the federal laws prohibiting the mailing of obscene materials, *Smith v. United States*, 431 U.S. 291, 304, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977) (18 U.S.C. § 1461); *Hamling*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (same), or the broadcasting of obscene messages. *Pacifica*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (18 U.S.C. § 1464). True, telephone messages differ from mailings and broadcastings because the caller rather than the provider controls where the message is received. Individuals can access adult telephone messages from anywhere in the country, potentially subjecting the providers of such messages to suit in any district. While we are sympathetic with the argument that providers, to avoid liability, may be forced to comply with the most stringent local obscenity standard, that is a matter for resolution only if and when the statute is challenged as applied.

Carlin's third argument that section 223 violates due process by authorizing the Commission to prosecute, adjudicate, and punish alleged violations is premature. *See Seafarers Int'l Union v. United States Coast Guard*, 736 F.2d 19, 26 (2d Cir.1984). Carlin's final argument that the statute unconstitutionally delegates legislative authority to the Commission is unavailing. Congress may validly provide a criminal sanction for violation of rules or regulations which it has empowered an administrative agency to promulgate if such delegation of authority is accompanied by sufficient guidelines and standards for the exercise of the authority. *See United States v. Davis*, 564 F.2d 840, 843–44 (9th Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978).

Petition to review denied; mandate stayed for ninety days to permit parties and intervenors to comply with Commission regulations.

---

tions will have to suffice to avoid any constitutional infirmity."
129 Cong.Rec. E5,966 (daily ed. Dec. 14, 1983) (statement of Rep. Kastenmeier). *See also* note

6 *supra;* 129 Cong.Rec. S16,866 (daily ed. Nov. 18, 1983) (statement of Sen. Trible).